**BELMONT INDUSTRIES, INC., Appellant,**

v.

**BETHLEHEM STEEL CORPORATION.**

No. 74-1599.

United States Court of Appeals, Third Circuit.

Argued Feb. 7, 1975.

Decided March 7, 1975.

David Berger, H. Laddie Montague, Jr., Paul J. McMahon, Philadelphia, Pa., for appellant; David Berger, P. A., Philadelphia, Pa., of counsel.

John G. Harkins, Jr., Patricia L. Freeland, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellee; Edward C. Perkins, David M. Beckwith, Bethlehem, Pa., of counsel.

Before ADAMS, ROSENN and WEIS, Circuit Judges.

## OPINION OF THE COURT

### PER CURIAM:

This appeal, after a jury verdict for defendant Bethlehem Steel Corporation in an anti-trust case, raises two principal issues with respect to the conduct of the trial. First, plaintiff, Belmont Industries, claims that the trial judge erred in refusing, upon a motion made after the close of evidence, to strike cross-examination testimony which, although violating both the hearsay and best evidence rules, had been received without objection. The second error, asserts Belmont, is the district court's foreclosure of evidence concerning Bethlehem's alleged termination, after the filing of the complaint, of the credit previously extended to Belmont.

Since the district court did not err with respect to either ruling, its judgment will be affirmed.

### Facts

Bethlehem is a vertically integrated steel producer. Two phases of its operations are relevant to this case: 1) the production of structural steel in the form of shapes and plates, and 2) the fabrication and erection of that structural steel.[1] Because the cost of transporting steel from the mill where it is manufactured to the building site is a significant factor in the fabricator's total cost, fabricators generally purchase the major portion of their structural steel, particularly in the larger sizes, from the nearest available manufacturing plant. Bethlehem's mill at Bethlehem, Pennsylvania is the closest one to the Philadelphia market. Consequently, Belmont contends, Bethlehem Steel had a natural, and concededly lawful, monopoly of the market for the manufacturing of structural steel for sale in the Philadelphia area.

In contrast to Bethlehem's vertically integrated operations, Belmont functioned, until 1971, as an independent steel fabricator, operating primarily in the Philadelphia area. Since Belmont did not operate steel manufacturing facilities, it was dependent on steel producers like Bethlehem for its supply of structural steel. Thus, Belmont was in the dual position of purchasing much of its required structural steel from Bethlehem's manufacturing division, while at the same time competing with another division of Bethlehem in the fabrication and erection market.

Belmont filed suit against Bethlehem on December 18, 1970, averring that Bethlehem had monopolized or attempted to monopolize the market for the fabrication and erection of structural steel in the relevant geographic area.[2] Specifically, the theory advanced by Belmont is that Bethlehem drove down prices in the fabrication market by entering bids on fabricating jobs that produced losses or unreasonably low profits to Bethlehem's fabricating division. Bethlehem's pur-

---

1. The fabrication of structural steel consists of cutting structural steel into proper lengths, drilling or punching holes in the steel, and finally welding and painting the steel. Erection of structural steel involves transporting the steel to a building site and then assembling the steel to form structural framework of buildings or bridges.

2. In a second count Belmont originally alleged that Bethlehem had violated the Robinson-Patman Act with respect to sales of rolled structural steel and sales of fabricated steel projects. Prior to trial the district court granted Bethlehem's motion, unopposed by Belmont, for summary judgment on the Robinson-Patman count.

pose, Belmont argues, was to prevent fabricators located outside of Bethlehem's transportation-cost advantage area, who were not dependent on Bethlehem for their steel, from competing for jobs within the Philadelphia market. Thus, Belmont asserts, Bethlehem maintained its monopoly in structural steel manufacturing by depressing fabricating prices. As a result of the artifically low prices for fabricating and erecting structural steel, Belmont claims, it sustained substantial losses and was forced to close down its fabricating operations.

### Procedural History

The parties agreed to a bifurcated trial, and proceedings on the issue of liability began before a jury on September 26, 1973. In ten days of testimony, Belmont produced eight witnesses, four of whom were employees of Bethlehem. Counsel for Bethlehem based much of his cross-examination of these witnesses on documents taken from the files of Bethlehem and Belmont. During this cross-examination Bethlehem's counsel elicited from the witnesses a number of facts and figures of which the witnesses exhibited no personal knowledge. The documents were marked as exhibits but were not introduced into evidence. Counsel for Belmont made no objection to the questions as they were asked, and used a number of the documents as the basis for his own re-direct examination as well.

At the close of Belmont's case, counsel for Bethlehem began to offer the documents in question into evidence. At that point, the trial judge cautioned Bethlehem's counsel that offering these documents into evidence would, under local rule 33(b),[3] entitle Belmont to a rebuttal argument to the jury that would otherwise not be available to Belmont. Bethlehem then elected not to offer the documents into evidence. Instead, Bethlehem

rested its defense without presenting any evidence.

The following day, while the court was ruling on points for charge, counsel for Belmont stated:

> May I interrupt a minute because this Charge brings something to mind. . . . This had occurred as of yesterday evening, and that is the fact that defendant had identified documents and there was certain testimony taken on those documents and now those documents are not introduced as evidence and the testimony on those documents wasn't necessarily the witnesses' own present knowledge.

Belmont thereupon moved to strike the cross-examination testimony that related these documents, on the ground the testimony was hearsay.

After explaining that hearsay testimony that is introduced into evidence without objection is not invalid, the district judge denied Belmont's motion to strike the cross-examination testimony that was based on documents not placed into evidence by Bethlehem.

As to the second alleged error, Belmont, prior to closing its case, had offered testimony purporting to show that Bethlehem had decided to terminate Belmont's normal credit terms eleven days after the filing of this suit and that Belmont had forestalled the discontinuation only by threatening to obtain a preliminary injunction. Belmont asserted that the credit termination was tantamount to shutting off Belmont's only economical supply of steel and that such evidence was probative of Bethlehem's intent to monopolize. Bethlehem, on the other hand, denied that such a decision to terminate had ever taken place. Rather, Bethlehem claimed, the termination had been recommended by two Bethlehem credit officials, but that a higher-ranking executive had rejected

---

3. Local Rule 33(b) provides:

In actions which involve no third-party action, if evidence has been admitted on offer by both sides, plaintiff's attorney shall first sum up. . . . Defendant's attorney shall next sum up as the nature of his defense may require. Plaintiff's attorney may then reply. . . .

In like actions, if no evidence has been admitted on offer of any defendant, the same order of summation shall prevail, except that plaintiff's attorney shall not reply.

the recommendation. The district court refused to allow Belmont to present evidence on the subject.

The case was submitted to the jury on a series of interrogatories. The jury found that Bethlehem "had the power to control prices or exclude competitors from the market for fabricating and erecting structural steel," but that Bethlehem had neither the intent to exercise such power nor the intent to achieve such power. Accordingly, judgment was entered in favor of Bethlehem.

Belmont moved for a new trial on the grounds that the district court had erred in refusing to strike the testimony grounded on the documents not in evidence, and that Belmont had been improperly precluded from presenting evidence on the alleged credit termination. In the motion for a new trial, Belmont for the first time argued that the testimony the district court had refused to strike violated the best evidence rule as well as the hearsay rule. The district court denied the motion,[4] and Belmont appealed to this Court.

*Denial of the Motion to Strike*

 When evidence has been admitted without objection, the district court has discretion in deciding whether or not to grant a motion subsequently made to strike the testimony on hearsay or best evidence grounds.[5] Here, the testimony in question had been admitted without objection. Belmont and Bethlehem had both closed their cases, and the court was proceeding to rule on requests for charge. The amount of testimony which Belmont asked the court to strike was considerable, and had been received at widely scattered times over the ten-day trial. In addition, Belmont's motion did

not specify which of the items of testimony were to be stricken.

We cannot say that the trial judge abused his discretion in determining that the possibilities of confusion to the jury, prejudice to the opposing party, and undue delay of a case about to be submitted to the jury outweighed the detriment suffered by Belmont resulting from the reception of this allegedly hearsay and secondary evidence.[6]

In MacCurdy v. United States,[7] the plaintiff asked the district court to strike the testimony of six witnesses, after their testimony had been received without objection. The plaintiff contended that no proper foundation had been established for the admission of the testimony of these witnesses and also that it was irrelevant. The court of appeals stated that "the trial court was clearly not guilty of any abuse of discretion in refusing to strike the testimony of these witnesses after it had been admitted without objection."

The cases cited by Belmont in support of its contention that its motion to strike was timely differ from the present situation. In Limbeck v. Interstate Power Co.,[8] the district court granted a motion to strike the testimony of two witnesses when the motion was made at the end of their testimony. The court of appeals sustained the authority of the lower court to strike. In the present case, we do not say that it would have been error for the trial judge to have granted the motion to strike; we decide only that it was not an abuse of discretion for the district court to refuse to strike the testimony.

The government attorney in Calhoun v. United States[9] suggested in his clos-

---

4. 62 F.R.D. 697 (E.D.Pa.1974).

5. Illingworth v. Industrial Molasses Corp., 272 F.2d 845, 848–49 (8th Cir. 1960); Metcalf v. United States, 195 F.2d 213, 216 (6th Cir. 1952); MacCurdy v. United States, 246 F.2d 67, 68 (5th Cir. 1957).

6. *See* MacCurdy v. United States, 246 F.2d at 68; Chicago & N.W. Ry. v. Green, 164 F.2d 55, 63 (8th Cir. 1947); Greene v. New York

Central R., 209 F.2d 348 (2d Cir. 1953); McCormick, Handbook of the Law of Evidence § 52 (2d Ed. 1972); Wigmore, Evidence § 18 (3d Ed. 1940).

7. MacCurdy v. United States, 246 F.2d 67 (5th Cir. 1957).

8. 69 F.2d 249, 251 (8th Cir. 1934).

9. 384 F.2d 180, 184 (5th Cir. 1967).

ing argument that the jury should reduce the condemnation award because plaintiff was an out-of-state resident. Counsel for plaintiff did not object contemporaneously but, when the court asked for additional points for charge, requested that the court instruct the jury to disregard the specific reference to the plaintiff's non-resident status. The court of appeals held that the district court erred in refusing such a charge. That situation is distinguishable, however, because of the "extremely prejudicial" nature of the remark and the comparative simplicity of the requested remedy.

■ Belmont argues that the cross-examination on the basis of the documents was not improper, and that therefore the opportunity to object did not arrive until Bethlehem failed to put the documents into evidence. However, the objection arose, if at all, when Bethlehem solicited testimony based on documents not then in evidence, since at that time a proper foundation had not been established for the questions. If Belmont had raised its objections at the time the questions were being propounded to the witnesses, Bethlehem and the court would have been able to deal with such objections in an orderly fashion. As the court stated in a similar situation in United States v. Aluminum Company of America,[10] "it would be unjust to Alcoa to permit a ground of objection [raised by the United States] to prevail which was not unambiguously interposed until after the taking of testimony was completed. If it were otherwise, then, . . . Alcoa would be deprived of opportunity [sic] to cure or attempt to cure the defect if any exist-

ed." Faced with contemporaneous objections, Bethlehem might have chosen to drop the line of questioning, or to lay a proper foundation for it, or to attempt to elicit the same information in some non-objectionable manner.

The conclusion that the district court did not abuse its discretion in refusing to strike the testimony is reinforced by Belmont's adoption of at least a portion of the testimony relating to information drawn from documents not in evidence when counsel for Belmont predicated his redirect examination on some of the same documents.[11]

■ As to Belmont's best evidence objection to the testimony, it is well-settled law that a party may not seek a new trial on the basis of objections to evidence not brought to the court's attention at the original trial.[12]

### Exclusion of the Alleged Credit Termination

■ In an anti-trust suit evidence of events which occur after the filing of the complaint may be probative of the intent of the parties.[13] However, though relevant, evidence of subsequent events may be excluded from trial in order to protect other legitimate interests of the court and the opposing party. As stated in McCormick:[14]

There are several counter-balancing factors which may move the court to exclude relevant evidence if they outweigh the probative value. . . . First, the danger that the facts offered may unduly arouse the jury's emotions of prejudice, hostility or sym-

10. 35 F.Supp. 820, 827 (S.D.N.Y.1940). See also Revlon, Inc. v. Buchanan, 271 F.2d 795 (5th Cir. 1959).

11. See Trouser Corp. v. Goodman & Theise, 153 F.2d 280, 284, 287–88 (3d Cir. 1946); Bevard v. Bevard, 103 F.Supp. 533 (D.D.C.1952).

The situation here is distinguishable from that in United States v. DeCarlo, 458 F.2d 358, 372 fn. 1 (3d Cir. 1972), where Judge Aldisert, in his dissent, stated that the party opposing the admission of the evidence had not adopted that evidence by proceeding to

cross-examine the witness regarding the challenged testimony after he had made the objection and the trial court had overruled it.

12. United States v. Sytch, 275 F.2d 475, 477 (3d Cir. 1968); Hornin v. Montgomery Ward & Co., 120 F.2d 500, 504 (3d Cir. 1941).

13. Cornwell Quality Tools Co. v. C. T. S. Co., 446 F.2d 825, 832 (9th Cir. 1971). See United Mine Workers v. Pennington, 381 U.S. 657, 670 n. 3, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

14. McCormick, supra, § 185.

pathy. Second, the probability that the proof and the answering evidence that it provokes may create a side issue that will unduly distract the jury from the main issues. Third, the likelihood that the evidence offered in the counterproof will consume an undue amount of time.

 The decision whether the risk of unreasonably prolonging the trial or prejudicing or distracting the jury justifies exclusion of proferred evidence is committed to the discretion of the district court.[15]

 The trial judge here did not abuse his discretion in excluding evidence of the alleged credit termination. The parties are agreed that Bethlehem in fact continued to extend credit to Belmont after the complaint was filed. Belmont alleges that Bethlehem did not carry through with its planned credit termination only because Belmont threatened to obtain an injunction against Bethlehem's doing so. Bethlehem claims that the recommendation that it cease extending credit to Belmont was made on the basis of a legitimate concern for the credit-worthiness of Belmont, and further contends that the Bethlehem official responsible for such decisions rejected the recommendation prior to the receipt of Belmont's threat to seek an injunction. Whatever relevance the alleged credit termination has to the principal issues for trial,[16] resolving the question whether Bethlehem did plan to cut off Belmont's credit and if so its motivation in doing so, would have consumed considerable trial time.[17] Moreover, there was a risk that the presentation of conflicting testimony on this collateral matter might obscure the central issue in the minds of the jury and confuse the jury with unrelated facts.[18] The excluded evidence also might have provoked a decision by the jury on an emotional basis rather than on a rational consideration of all the evidence in the case.[19]

Accordingly, the decision of the district court will be affirmed.

---

**15.** Kane v. Ford Motor Co., 450 F.2d 315, 316 (3d Cir. 1971); Cafasso v. Pennsylvania R. Co., 169 F.2d 451 (3d Cir. 1948).

**16.** The antitrust violation alleged in the complaint is not as in Fortner v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), a tie-in between the sale of goods and the extension of credit.

**17.** Independent Iron Works v. United States Steel Corp., 322 F.2d 656, 669–70 (9th Cir. 1963).

**18.** Independent Iron Works, 322 F.2d at 670; Cromling v. Pittsburgh & Lake Erie R., 327 F.2d 142, 151–52 (3d Cir. 1963).

**19.** *See* United States v. 88 Cases, 187 F.2d 967, 974–75 (3d Cir. 1951); International Shoe Machine Corp. v. United Shoe Machinery Corp., 315 F.2d 449, 459 (1st Cir. 1963); McCormick, *supra,* § 185.